LEVI GUTRU, GUARDIAN, APPELLANT, V. JAMES MCVICKER,
APPELLEE.

FILED FEBRUARY 20, 1909. No. 15,503.

Insane Persons: CONVEYANCES: SETTING ASIDE: EVIDENCE. . In an action
by a guardian of an alleged incompetent person to set aside
his ward's conveyances of real estate, made before the appoint-
ment of such guardian, on the ground of mental incompetency,
and for fraud and imposition by the grantee practised upon the
grantor, the testimony examined, discussed in the opinion, and
*held* sufficient to sustain the decree for defendant upholding the
validity of the conveyances.

APPEAL from the district court for Dodge county: CON-
RAD HOLLENBECK, JUDGE. *Affirmed.*

*John J. Sullivan* and *H. Halderson,* for appellant.

*E. F. Gray, contra.*

DEAN, J.

This is an action tried in the district court for Dodge
county, wherein the appellant, who was plaintiff therein,
and is hereinafter called plaintiff, in substance alleges his
appointment on February 14, 1907, as guardian of one

Ole Ramstad, then about 80 years of age, and who "now is, and for more than 25 years last past has been, a man of feeble intellect and mentally incompetent to transact business, or to have the charge, management or control of his property," and who it is alleged "was always mentally feeble, part of the time wholly demented"; that for over 25 years last past said Ramstad has been the equitable owner and in full possession and occupancy of 160 acres of farm land in Dodge county; that on January 20, 1887, 80 acres thereof was deeded land, the other 80 acres being held by him under a contract of purchase from the Union Pacific Railroad Company; that on said date the defendant, who had long been a neighbor and professed friend and confidential adviser of said Ramstad, induced him, without consideration to execute and deliver to him a warranty deed to the deeded tract and an assignment of the railroad contract; that there were then incumbrances on said land amounting to less than 5 per cent. of its then value, which were thereafter paid by defendant, who took a deed of the railroad land to himself; that said Ramstad has by himself or tenant for over 25 years last past continuously occupied said land; that on May 7, 1896, defendant induced Ramstad to accept from him a life lease to the land at an expressed annual rental of $1; that no rent was ever demanded or paid; that said instruments are fraudulent and create a cloud upon Ramstad's title. Plaintiff prays for cancelation thereof, and for a conveyance of the land from defendant to Ramstad, and that the title be quieted in Ramstad.

Appellee, who was defendant in the district court, and is hereinafter called defendant, answered, denying generally and specifically all material allegations of the petition, but admitted the execution and delivery of the deed and assignment and lease, and alleged payment by himself of said incumbrances and about $100 to Ramstad, all in pursuance of an agreement of purchase of said land from Ramstad made on January 20, 1887, subject to an agreement for a life estate therein, reserved by Ramstad,

which was reduced to writing May 7, 1896; that Ramstad agreed to and did pay all taxes subsequent to January 20, 1887; that plaintiff and Ramstad conspired to defraud defendant; that plaintiff's causes of action are barred by the statute of limitations. Plaintiff's reply denies every statement of new matter in the answer, except such as admit allegations in the petition. Upon issues joined and trial had defendant had judgment, and plaintiff appeals.

Upon the question of the mental competency of Ole Ramstad considerable testimony was introduced on both sides, and on the part of plaintiff some of it related to a time somewhat remote from the date of the execution of the instruments which form the basis of this action. One  of his witnesses on this point testified he had not seen Ramstad to exceed four times within 30 years, the last time before the trial being in 1894, while another first made his acquaintance in 1899 or 1900. The testimony of another relates to incidents occurring "in 1887 or 1888" when the witness was 13 years of age. The proof shows Ramstad was born in Norway, and came to the United States "the year Fremont run for president," as he expresses it; that he never married and is about 80 years of age, and for many years before the trial lived alone in a farm house in Dodge county, doing his own housework, his sole companions being two or three favorite dogs. It is in evidence that he destroyed some of these animals before his departure from home to be gone a short time, so that, as he said, "they would not worry after him while he was gone"; that he then buried them, marking the burial place with sticks; that he dug a hole beside his house "about a foot around" that he might there "listen to the house rot down"; that he "told about having dreams and visions"; that he said he destroyed his dogs, fearing he would become ill and die, and they would devour his remains; that he told a witness he feared the designs of a certain matrimonially inclined female who was about to engage his attention in a

breach of promise suit, and that he was going to Fremont to "fix his land so that this woman could not get it," and that "he would kill himself before he would submit to her demands"; that he ordered and erected a monument, and "wanted to be buried with his dogs." It is in evidence by the testimony of six or seven witnesses who were called on the part of plaintiff that one of Ramstad's most pronounced peculiarities was that of "talking to himself," and from the evidence it would seem with the utmost impartiality as between his own and the English language. The fact that he used both languages seemed to add to the prominence of this feature, and gave rise to some testimony indicating that the witnesses could not understand him. Some stress is laid upon this feature by counsel in his brief and in the oral argument. But if the courts accept proof of this characteristic as conclusive or even *prima facie* evidence of "mental incompetency to transact business," the sphere of the guardian's activity may thereby become so greatly enlarged as to prove burdensome to him and embarrassing to the community.

Ole Ramstad, the ward, was sworn and testified on the part of plaintiff. He was not interrogated with reference to the alleged designing woman, nor in regard to his alleged statement of a purpose once entertained by him of placing his property beyond her reach. He testified it was agreed between him and Gutru the latter was to be appointed his guardian that this suit might be brought. It is shown by Ramstad's testimony that, from the time he executed the conveyances to the time of trial in the district court in July, 1907, from the proceeds of the land in which he retained the life lease, and by investments in town property in the village of Rogers, he, unaided and alone, had accumulated property, both real and personal, of the value of several thousand dollars. He testified that at the time of the trial he owned three houses in Rogers that rented for about $5, $6 and $8 a month, respectively, and 28 business lots therein, one of them being worth $500. The ward's testimony thus tends

at least to rebut his guardian's allegation of mental incompetency "to transact business."

Levi Gutru, plaintiff, testified he first met Ramstad in July, 1906; that Ramstad said to him he wanted witness "to look after his business, and he said I should support him and take care of him, and, if there was anything left, I should have it." Witness testified a will and power of attorney were executed by Ramstad the second time he met him, and that he, the witness, suggested that he "had to have something to look after his business" and the power of attorney was then made, and he repeats Ramstad said, "if anything was left, I could have it." He says at that time he had not discovered his mental condition, but "ascertained the fact later." County Judge Mapes of Colfax county testified that about six months before this action was tried the plaintiff and his ward, Ramstad, called at his office in Schuyler to inquire about the appointment of a guardian for the latter, at which time Gutru exhibited a will to witness, made in his own favor, and told him, he, Gutru, had the whole matter in his own hands. Thus it is shown by the testimony Gutru is the sole beneficiary of a will executed by Ramstad on the occasion of his second meeting with him a few months before this suit was tried. From the testimony of Judge Mapes and of Gutru we are convinced the solicitude of the latter for the welfare of his recently acquired ward, the lone and childless relic of 80 years, is not inspired solely by high resolve and disinterested motive, but is in part at least the outgrowth of a sordid desire for gain. His conduct, as disclosed by his own testimony, tends to establish defendant's allegation of an attempt to defraud him of his title.

On the part of the defendant many witnesses were produced who testified with reference to Ramstad's mental condition. Their acquaintance with him for the most part covered a period of 25 years and over. Among these were merchants with whom he had done business for many years, many farmer neighbors, and a banker, with whom

he had kept a bank account. They seem to agree he was for the time embraced in the petition as well equipped to carry on his business affairs as the average citizen in the community. Upon the question of Ramstad's mental competency, we conclude, after a careful examination of the testimony, the plaintiff has failed to establish the material allegations of his petition. The proof shows he seemed to be eccentric in manner and odd in expression, due in part no doubt to the fact he retained some of the customs and much of the language of his native land. Ramstad is not shown by the proof to have been "mentally incompetent to transact business," but, on the contrary, it affirmatively appears from the testimony a fair success has attended upon his modest business ventures.

Testimony was introduced by both parties with reference to the quality and the value of the land involved in this action at the time the conveyances were executed and delivered. On direct examination one of plaintiff's witnesses testified it was then worth $17 or $20 an acre, but on cross-examination he says he was then but a boy, and did not know the price of land there, nor of any being sold in that vicinity, nor the value of the land in question at that time. Another witness on the part of plaintiff on the direct examination fixed the value at $10 an acre, but on cross-examination fixed it at about $7 or $8 if sold for part cash and partly on time. From a careful examination of all the testimony upon this feature we find the land was for the most part low and wet, and at the time indicated was worth from $5 to $7 an acre.

The proof fails to sustain the plaintiff's allegations of fraud practised upon Ramstad by the defendant in effecting the execution and delivery of the instruments forming the basis of this action. The defendant testified in substance that Ramstad in January, 1887, told him he was about to lose his land, and proposed if witness would pay his debts and give him a little money to live on until some revenue could be derived from the rent of the land he would convey it to defendant, but wanted to retain a

life estate therein, to which defendant testifies he agreed after some reflection, and the said instruments were then executed and delivered.   He testifies he gave to Ramstad from time to time money to live on in pursuance of said agreement of purchase in the total sum of about $100, which with the incumbrances on the said land assumed and paid by defendant amounted in all to about $600; that he gave to Ramstad the "life lease" of said land in May, 1896; that the said land was mostly low and wet, with some gumbo, and no sale for land there in 1887 that he can recall.   Defendant's testimony on this point is corroborated by several witnesses who testify that Ramstad told them at the time, or shortly after the execution of the deed and assignment, in substance, that he was about to lose his land because of the debts against it, and that he sold it to the defendant, who assumed his debts.   By witnesses who testified with reference to a later date it is shown that Ramstad told them he obtained a "life lease" from defendant in 1896 to assure his possession in the event of defendant's death.   There is not much dispute in the record concerning the incumbrances paid off by the defendant upon the land, the plaintiff alleging they were "not in excess of $480."   From the proof we conclude the defendant paid a valuable consideration for the land and the transaction was in no sense a gift nor tainted by fraud, as pleaded and argued by plaintiff, nor is there any proof in the record of the abuse by defendant of alleged relations of trust and confidence existing between defendant and Ramstad.

The defendant pleads the statute of limitations as another defense, relying upon sections 7, 12 and 17 of the code, but it is unnecessary to consider this point, because upon the merits the controversy is resolved in favor of the defendant.

The decree of the district court is right and is in all things

AFFIRMED.